**TANNERS' COUNCIL OF AMERICA, INC., Petitioner,**

v.

**Russell E. TRAIN, as Administrator, Environmental Protection Agency, Respondent.**

**Nos. 74–1740, 74–1753.**

United States Court of Appeals, Fourth Circuit.

Argued April 22, 1975.

Decided March 10, 1976.

Richard E. Schwartz, Washington, D. C. (James F. Rill, Collier, Shannon, Rill & Edwards, Washington, D. C., on brief), for petitioner.

Kathryn A. Oberly and Eva R. Datz, Attys., U. S. Dept. of Justice, and Nancy L. Speck, Atty., E. P. A., Washington, D. C. (Wallace H. Johnson, Asst. Atty. Gen., G. William Frick, Associate Gen. Counsel, E. P. A., Washington, D. C., on brief), for respondent.

Edward L. Strohbehn, Jr., Washington, D. C., and Angus C. Macbeth, New York City, on brief for amicus curiae, Natural Resources Defense Council, Inc.

Before RIVES* and BREITENSTEIN**, Senior Circuit Judges, and WIDENER, Circuit Judge.

RIVES, Circuit Judge:

■ These actions are brought by Tanners' Council of America, Inc., a trade association for the leather tanning and finishing industry, to set aside regulations establishing "effluent limitations guidelines" and "standards of performance" for the "Leather Tanning and Finishing Industry Point Source Category." These regulations were issued by the Administrator of the Environmental Protection Agency (hereinafter "the Administrator") on April 9, 1974 (39 Fed. Reg. 12958, *et seq.*, 40 C.F.R. Part 425), under the authority of sections 301, 304, 306, 307, 316 and 402 of the Federal Water Pollution Control Act, as amended (hereinafter "the Act").[1] Under § 509(b)(1), review of these regulations lies in the United States Court of Appeals. *du Pont v. Train*, 528 F.2d 1136 (4th Cir. 1976) [filed 1975].

The "standards of performance" established by these regulations set pollution limits which must be achieved by "new sources," defined in the statute as a source of pollution discharge, "the construction of which is commenced after the publication of proposed regulations prescribing a standard of performance under this section which will be applicable to such source." § 306(a)(2). "Effluent limitations guidelines"[2] prescribe the amount of pollution discharge permitted by existing plants and are divided into two phases—a 1977 stage and a 1983 stage. In promulgating the regulations, the EPA divided the leather tanning and finishing industry into six major subcategories, derived principally from similarities in processes and waste loads.[3] For each subcategory, the 1977 and new source regulations set a single-number effluent limitation for five pollution parameters—5-day biological oxygen demand $(BOD_5)$,[4] total suspended solids (TSS),[5] chrome, oil and grease, and pH.[6] For exist-

---

* Senior Circuit Judge, U. S. Court of Appeals for the Fifth Circuit.

** Senior Circuit Judge, U. S. Court of Appeals for the Tenth Circuit.

1. 33 U.S.C. § 1251, *et seq.* (Supp.1975).

2. For a discussion of the statutory authority of the Administrator to issue "effluent limitations guidelines," see *du Pont v. Train*, 541 F.2d 1018, at 1026 (4th Cir. 1976) [filed 1975].

3. These subcategories are: (1) hair pulp unhairing with chrome tanning and finishing, (2) hair save unhairing with chrome tanning and finishing, (3) unhairing with vegetable and alum tanning and finishing, (4) finishing of tanned hides, (5) vegetable or chrome tanning of unhaired hides, (6) unhairing with chrome tanning and no finishing.

4. Biological oxygen demand (BOD) is a measure of the oxygen consuming capabilities of the organic matter in the wastewater. $BOD_5$ is BOD measured over a five-day period.

5. Total suspended solids (TSS) are particles of organic and inorganic matter suspended in the wastewater.

6. pH is a logarithmic expression of the concentration of hydrogen ions. At a pH of 7, the

ing sources, 1983 stage, specific limitations were set for these same five pollution parameters and additionally for sulfide, total kjeldahl nitrogen (TKN),[7] and fecal coliform.[8]

Petitioner first challenges these regulations on the ground that they are not in accord with the Act. This contention is founded on petitioner's view that §§ 301 and 304 of the Act do not authorize the Administrator to set effluent limitations (as opposed to guidelines that are merely informational to the permit writers). This Court rejected this interpretation in *du Pont v. Train*, 541 F.2d 1018 (4th Cir. 1976), and a re-examination of this question is unnecessary here. Petitioner's second line of attack is that these regulations are arbitrary and capricious due to alleged technical errors made by the Administrator in the rulemaking process.

## STANDARDS OF REVIEW

■ The applicable standard of review has been stated by this Court in *du Pont v. Train, supra,* at 1026. Briefly stated, the authority of this Court to set aside agency action is limited by the strictures of The Administrative Procedure Act, 5 U.S.C. § 706(2)(A). To be judicially annulled, agency action must be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." While this Court cannot substitute its judgment for that of the agency, the agency must fully explicate its course of inquiry, its analysis, and its reasoning. Furthermore, grounds

relied upon by the Agency must be clearly disclosed in and sustained by the record. See cases cited in *du Pont v. Train, supra,* at 1026. On these terms, we now review the specific regulations that are challenged.

## 1977 LIMITATIONS

The statutory specification for effluent limitations for existing sources 1977 stage is the application of "the best practical control technology currently available (BPCTCA)." § 301(b)(1)(A). In establishing BPCTCA standards, § 304(b)(1)(B) of the Act requires the Administrator to consider the following: (1) the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application; (2) the age of equipment and facilities involved; (3) the processes employed; (4) the engineering aspects of application of various types of control techniques; (5) process changes; (6) non-water quality environmental impact (including energy requirements). Furthermore, BPCTCA effluent standards are to rely primarily on end-of-manufacturing treatment facilities but may include control technologies within the process if these measures are considered normal practice within the industry.[9]

■ Normally, EPA should establish BPCTCA standards on the basis of the average performance of the best existing plants in the subcategory. The Agency may, however, look to the results achieved by plants in other industries if it finds that the level of achievement in a subcategory is

---

hydrogen and hydroxyl ion concentrations are essentially equal and the water is neutral. A pH value below 7 indicates acidity, a higher value indicates alkalinity.

7. Total kjeldahl nitrogen (TKN) is ammonia nitrogen plus the organic nitrogen content in wastewater. TKN indicates the major nitrogen impact upon the waste treatment plant or receiving stream.

8. Fecal coliforms are bacteriae originating in the intestinal tract of warm-blooded animals. The presence of fecal coliforms in wastewater has a high correlation with increased numbers of both pathogenic viruses and bacteriae. An example of these is Salmonella.

9. Compare the 1977 standard in § 304(b)(1)(B) ["control measures and practices"] with the 1983 standard in § 304(b)(2)(B) ["best control measures and practices achievable including treatment techniques, process and procedure innovations, operating methods and other alternatives"] and the new source standards of performance in § 306(a)(1) ["control technology, processes, operating methods, or other alternatives"]. See also "Development Document for Effluent Limitations Guidelines and New Source Performance Standards for the Leather Tanning and Finishing Point Source Category" [hereinafter cited as Dev.Doc.] 125 (1974).

uniformly inadequate. This transfer of technology is permissible only "if he [the Administrator] determines the technology to achieve those higher levels can be practicably applied." S.Rep.No.92–414, 92d Cong., 1st Sess. (1971), *A Legislative History of the Water Pollution Control Act Amendments of 1972,* 93d Cong., 1st Sess. 1468 (Jan. 1973) [hereinafter cited as Leg. Hist.]. See also Senate Consideration of the Report of the Conference Committee, October 4, 1972, Leg.Hist. 169–170. The Eighth Circuit in *CPC International, Inc. v. Train,* 515 F.2d 1032, 1048 (8th Cir. 1975), has held that before EPA can make a determination that a technology can be practicably applied, the Agency must: (1) show that the transfer technology is available outside the industry; (2) determine that the technology is transferable to the industry; (3) make a reasonable prediction that the technology if used in the industry will be capable of removing the increment required by the effluent standards.[10]

In establishing the 1977 limitations, EPA concluded that there were no exemplary plants in the tannery industry, not because the industry had failed to employ primary and secondary treatment facilities, but because the Administrator was dissatisfied with the degree of removal obtained. See Dev.Doc. 129. Due to this finding, BPCTCA standards were not set on the basis of the average result of the best tanneries but on the transfer of technology[11] and performance data from the meat-packing industry. Comments on the proposed regulations brought out the dissimilarities in the raw waste loads between the meat-packing and tanning industries. Reflecting on these comments, the Agency recognized that the more fibrous, insoluble components of tannery wastes made tannery wastewa-

ter less susceptible to biological treatment. Consequently, the Agency revised the 1977 standards to permit a higher level of effluent concentration. 39 Fed.Reg. 12958 (April 9, 1974).

■ Petitioner contends that EPA erred in determining that existing waste treatment by all tanneries was "uniformly inadequate" and, alternatively, that, even if there were no exemplary plants in the tanning industry, EPA was in error to apply the performance data from the meat-packing industry with its vastly dissimilar wastes. The tanners' contention that exemplary plants do exist in the tannery industry was supported by the New York State Department of Environmental Conservation, Cert.Rec. 5364, and the Effluent Standards and Water Quality Information Advisory Committee, a study group established under § 515(a)(1) of the Act. Cert. Rec. 5850. These groups contended that several tannery plants achieve the lowest effluent levels that the wastewater from the particular processes and products will allow. EPA maintains that these existing treatment facilities in the industry are "uniformly inadequate" because of poor management and operating techniques. Dev.Doc. 93. This Court feels that the test of adequacy is almost entirely judgmental, and, therefore, the decision to establish 1977 standards on either the average of exemplary plants in the industry or a transfer of technology is best left in the hands of the Agency.

■ Whatever methodological route is followed, the Administrator must nevertheless establish that the levels are achievable by the affected plants. Here, the contractor found that "[t]he tannery industry does

---

**10.** Although the *CPC International* case was concerned with new sources and the requirement of § 306 that the standards reflect the application of "the best available *demonstrated* control technology," the same reasoning applies to the 1977 limitations. Unless the required levels of reduction can be met by existing plants, the designated technology cannot be

said to be "currently available." See § 301(b)(1)(A).

**11.** These treatment steps are: (1) preliminary screening, (2) equalization and primary sedimentation, (3) secondary biological treatment, and (4) chrome recycle. See Dev.Doc. 128.

not achieve this level of effluent reduction." Dev.Doc. 129. A few plants are presently capable of meeting the limitations for some, but not all, of the pollution parameters:

"One plant in subcategory 1 (383) and one plant in subcategory 3 (24) meet the BOD limitations in kg/1,000 kg (16/1,000 lb.) but not TSS limits. Two plants in subcategory 3 (47 and 179) meet the TSS limitations and almost achieve the BOD limitations." Dev.Doc. 129.

EPA contends that by "conscientious adherence to well-known operational and maintenance procedures" tanneries can achieve the consistency of results needed to meet these reduction levels. Dev.Doc. 93. There is no evidence, however, in the record that would reveal the reasonableness of this conclusion.

To uphold these regulations, this Court would have to trust completely EPA's conclusions. The record, however, implies that these conclusions are the product of guesswork and not of reasoned decision-making. When EPA became convinced of the dissimilarities in the wastes of the tannery and meat-packing industries, it arbitrarily increased the pollution levels transferred from the meat-packing industry,[12] rather than use waste reduction levels actually demonstrated in the tannery industry or a comparable industry. No scientific data or other demonstrative evidence [13] was given to substantiate these final effluent levels. EPA's only justification for these higher levels was that they reflected "a more practicable effluent concentration." 39 Fed. Reg. 12958 (April 9, 1974). The regulations are, therefore, remanded to the Administra-

12. Compare the Final Development Document (Cert.Rec. 5998) with the Initial Development Document (Cert.Rec. 5620). In the proposed regulations, the limits were:

SUBCATEGORY
Kg/1000 Kg hide (lb/1000 lb. hide)

| Parameter | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| $BOD_5$ | 2.7 | 3.2 | 2.5 | 1.0 | 3.2 | 1.4 |
| Total Chromium | 0.05 | 0.06 | 0.05 | 0.02 | 0.06 | 0.03 |
| Oil & Grease | 0.53 | 0.63 | 0.50 | 0.24 | 0.63 | 0.34 |
| SS | 3.00 | 3.50 | 2.8 | 1.1 | 3.5 | 1.5 |

In the final regulations, the limits were:

SUBCATEGORY
Kg/1000 Kg hide (lb/1000 lb. hide)

| Parameter | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| $BOD_5$ | 4.0 | 4.6 | 3.8 | 1.6 | 4.8 | 2.8 |
| Total Chromium | 0.10 | 0.12 | 0.05 | 0.10 | 0.06 | 0.10 |
| Oil & Grease | 0.75 | 0.90 | 0.75 | 0.25 | 0.90 | 0.35 |
| SS | 5.00 | 5.8 | 4.8 | 2.0 | 6.0 | 3.4 |

13. Since publication of these regulations, EPA has accumulated data from treatment plants which the Administrator in his brief contends confirms his assessment of the 1977 standards. These are found at appendices C, D, and E to respondent's brief and are subject to a motion to strike by petitioner. It is a well-settled principle of administrative law that agency action cannot be sustained on the basis of information not relied upon by the Administrator and disclosed in the record. After-the-fact rationalizations will never suffice. See discussion in *du Pont v. Train, supra* note 1 at 1026, and cases cited therein. EPA's reliance upon *Amoco Oil v. EPA*, 163 U.S.App.D.C. 162, 501 F.2d 722 (1974) is unfounded. In that case, the court admitted into the record, after issuance of the regulations, the testimony of the presidents of Ford and General Motors before a Senate subcommittee. The court justified the admission on the grounds that the matter was public testimony given to a governmental body and there was reconsideration by EPA in light of the statements. Neither of these factors is present in our case. Nor is this information uncontested evidence supplied by the companies themselves as in *American Iron and Steel Institute v. EPA*, 526 F.2d 1027, 1055 n. 61 (3d Cir. 1975). On remand, EPA may rely on the information contained in these appendices if introduced into the record.

tor to establish by evidence in the record that tanneries can achieve the levels of reduction required by the 1977 limits by use of the designated technology.

██ Petitioner also contends that EPA failed to take temperature into account in formulating its 1977 effluent limitations guidelines. The tanners argue that an allowance for temperature should have been made since cold weather slows down the biodegradability of the wastes in the aerobic and anaerobic lagoons. There is the additional problem of higher waste loads in winter since hides contain more hair in winter than in summer. Performance data from operating plants reflects a seasonal variability in the effluent concentrations of the treated wastes. Cert.Rec. 5696–5701. The Agency's response to this problem has been rather unsatisfactory:

> "Temperature impacts have been significantly reduced through increases in the proposed limitations along with the variance for small and medium sized tanneries. Therefore, the revised limitations are technically and economically achievable through the application of best practicable control technology without a temperature variance." 39 Fed.Reg. 12958 (April 9, 1974); 40 C.F.R. Part 425.

On remand, EPA should reconsider its decision not to make allowance for temperature in light of the strong evidence in the record that reduced removal efficiency occurs during cold weather.[14]

Petitioner has also challenged the regulations on the ground that tanneries applying even the most sophisticated pollution technology cannot meet the 2 mg/1 chromium limitation or the stringent standard for oil and grease. Because the 1977 standards are being remanded to the Administrator to substantiate their achievability, we see no reason to decide these questions at the present time.

## NEW SOURCE STANDARDS

Section 306(a)(1) defines a new source standard of performance as "a standard for the control of the discharge of pollutants which reflects the greatest degree of effluent reduction which the Administrator determines to be achievable through application of the *best available demonstrated control technology*, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants." For the Leather Tanning and Finishing Point Source, EPA's new source standards are identical to those for existing plants, 1977 stage. The Development Document explains this result as follows:

> "Although, better process control and more efficient tannery operations may result for new facilities, the actual raw waste load in terms of kilograms (pounds) per thousand kilograms (pounds) of hide is not expected to change substantially. Treatability of the waste is, also, not likely to differ significantly from that existing for present facilities." Dev.Doc. 137.

Because these new source standards are derivative and have not been independently established, their validity is tied to that of the 1977 regulations. Therefore, in view of our disposition of the 1977 regulations, the new source standards of performance are similarly set aside and remanded to the Administrator.

---

14. The Seventh Circuit was presented with a similar argument over seasonal and temperature variability by the meat-packing and slaughterhouse industry in *American Meat Institute v. EPA*, 526 F.2d 442 (7th Cir. 1975). There, the court upheld the Administrator's conclusion that the effect of climate did not warrant a temperature allowance on the basis of performance data in the record demonstrating that the 1977 standards were being met year round by some plants in the industry. *Id.* at 455. Nowhere in the record of this case is there reference to a waste treatment facility in the leather tanning and finishing industry or a comparable industry where the required levels of reduction are met throughout the year.

**1983 LIMITATIONS**

■ Section 301(b)(2)(A) of the Act provides that the effluent limitations for existing sources to be employed by July 1, 1983, shall require application of "the best available technology economically achievable (BATEA)." The tanners contend that EPA ignored the statutory requirement that the technology be "available." Availability, they contend, means that the technology be "demonstrated by at least pilot plant performance." (Petitioner's Brief at 81.) The legislative history, however, does not bear out petitioner's position that the Administrator is confined to treatment technology presently in use:

> "The distinction between 'best practicable' and 'best available' is intended to reflect the need to press toward increasingly higher levels of control in six-year stages. Through the research and development of new processes, modifications, replacement of obsolete plans and processes, and other improvements in technology, it is anticipated that it should be possible, taking into account the cost of controls, to achieve by 1983 levels of control which approach and achieve the elimination of the discharge of pollutants." Leg.Hist. 170.

This Court also finds significant the difference in language found in the statute. Section 301(b)(1)(A) defines the 1977 standards in terms of technology that is "currently available." In § 306(a)(1), the Administrator is directed to establish new source standards on the basis of "the application of the best available demonstrated control technology." While the terms "currently" and "demonstrated" in these sections imply that availability for purposes of the 1977 and new source regulations means technology presently in use, no such term is found in § 301(b)(2)(A). Thus, in establishing these 1983 standards, the Agency may look to the best performer in the industry and even assess technologies that have not been applied as long as the record demonstrates that there is a reasonable basis to believe that the technology will be available by 1983.

Like the 1977 standards, the 1983 limitations for the leather tanning and finishing industry were based on waste removal efficiencies achieved by other industrial treatment operations. Dev.Doc. 134. The controls designated as BATEA are essentially the 1977 technology with the addition of tertiary treatments.[15] The Development Document, in its assessment of the 1983 limits concluded:

> "best available control technology economically achievable appears achievable considering the developmental work being done on sulfide oxidation and nitrification-denitrification. There are several technical questions which need to be resolved prior to initiation of full-scale nitrification-denitrification facilities on a tannery waste. However, it is deemed that such questions can be answered by on-going research in other areas and by investigations initiated prior to 1983. To date no pilot work has been reported for nitrification of tannery wastes, hence, studies will be required to confirm design parameters required to implement an efficiently designed and operating facility." Dev.Doc. 135.

■ We recognize that the Act does put the Administrator in somewhat of a dilemma in promulgating 1983 limitations. While Congress intended that the 1983 limitations mandate an advance in pollution technology, it also required that these regulations be published within one year of the passage of the Act. § 304(b); *see also National Resources Defense Council, Inc. v. Train*, 166 U.S.App.D.C. 312, 510 F.2d 692, 710–714 (1974). At present, the 1983 limitations seem premature, but sections 304(b) and 301(d) place a duty on the Administra-

---

**15.** Wastewater is generally treated in sequential stages. Primary treatment involves the removal of readily settleable solids and other measures preparatory to biological treatment. In secondary treatment, wastes are consumed by bacteria that feed upon the organic matter in the wastewater and suspended solids are given time to settle out. Tertiary treatment involves advanced control measures; in this case, sulfide oxidation, nitrification and denitrification, and mixed-media filtration. See Dev. Doc. at i.

tor to revise these regulations periodically.[16] Although the single-number limitations EPA believes to be achievable by the application of BATEA are only tentative figures, the Administrator feels that these limitations should be defined now in order to give industry the maximum amount of lead time in which to implement the technology. (Respondent's Brief at 83–84.) Given this need for technological implementation and the statutory requirement of continuing Agency review of these regulations, we believe no useful purpose would be served by a remand of these effluent limitations guidelines to EPA for reconsideration. This Court concurs in the conclusion of the Third Circuit in *American Iron and Steel Institute v. EPA*, 526 F.2d 1027, 1075 (3d Cir. 1975), that in reviewing the 1983 regulations

> "the Act contemplates a period of a few years after which the accuracy of the Administrator's evaluations and projections can be reviewed in the light of actual experience."

 What is a reasonable belief today that these BATEA limitations can be achieved by 1983 would, however, not necessarily be a reasonable belief in 1981. Companies must make financial commitments and place orders for pollution equipment several years in advance of the 1983 deadline. When such time approaches, these 1983 regulations will have to be set aside unless EPA has more adequately demonstrated that the designated technology is effective in abating tannery wastes and is capable of achieving the 1983 reduction levels. Although application for judicial review of these water pollution regulations must generally be made within ninety days after the date of their promulgation, an exception has been provided for cases where the application is based solely on grounds which arose after the ninetieth day. We think that further review of these 1983 regulations is obtainable under this

provision since the reviewing court will be called upon to reassess the reasonableness of these regulations in light of the presence or absence of pollution data collected by EPA, including possible advances in equipment and process technology, taking place more than ninety days after the regulations are promulgated.

CONCLUSION

The effluent limitations guidelines for 1977 and the new source standards of performance are set aside and remanded to the Administrator for reconsideration in light of this opinion. The effluent limitations guidelines for 1983 are left in force, but the Administrator is reminded of his statutory obligation to revise these limitations and guidelines in light of the findings of his on-going research and review.