**AMERICAN MEAT INSTITUTE et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Defendant,**

**and**

**National Turkey Federation et al., Defendants–Intervenors.**

**Civ. A. No. 79–986–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.

July 3, 1980.

H. Woodrow Crook, Jr., Smithfield, Va.,
J. Stanley Stroud, James R. Henderson,
Mayer, Brown & Platt, Washington, D. C.,
James W. Gladden, Jr., Mayer, Brown &
Platt, Chicago, Ill., for plaintiffs.

Justin W. Williams, U. S. Atty., Norfolk,
Va., Alice Daniel, William Z. Elliott, Dept.
of Justice, Daniel Marcus, Marshall M. Marcus, U.S. Dept. of Agriculture, Washington,
D. C., for defendant.

John M. Hollis, Willcox, Savage, Lawrence, Dickson & Spindle, Norfolk, Va.,
Philip C. Olsson, Richard L. Frank, Olsson
& Frank, Washington, D. C., for defendants–intervenors.

MEMORANDUM OPINION

KELLAM, District Judge.

'The time has come,' the Walrus said,
  'To talk of many things:
Of shoes–and ships–and sealing wax–
  Of cabbages–and kings–
And why the sea is boiling hot–
  And whether pigs have wings.'

Lewis Carroll, *Through the Looking Glass*, Chapter IV

This matter comes before the Court on the cross motions for summary judgment filed by plaintiffs and defendant Department of Agriculture.[1] The plaintiffs in this case challenge the lawfulness of a final regulation of the USDA, alleging that its adoption was contrary to USDA's authority and was arbitrary, capricious and an abuse of discretion. The plaintiffs ask the Court to declare the regulation unlawful and to permanently enjoin the USDA from issuing any approval for any poultry product label bearing the term "Turkey Ham."

I.

■ The authority of this Court to set aside agency action is limited by the strictures of the Administrative Procedure Act, 5 U.S.C. §§ 701–706. To be annulled by this Court, the USDA regulation at issue must be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* at § 706(2)(A), (C). While this Court cannot substitute its judgment for that of the agency, the agency must fully explicate its course of inquiry, its analysis, and its reasoning. *Tanners Council of America, Inc. v. Train,* 540 F.2d 1188, 1191 (4th Cir.1976). Furthermore, grounds relied upon by the agency must be clearly disclosed in and sustained by the record. *Id.*

■ The Court is and ought to be reluctant to review and interfere with the Secretary's administration of the Act in question, but Congress has placed that burden on the courts. The courts must accept that duty and responsibility. The existence of a well explained administrative practice does not relieve the court of its "responsibility to determine whether that practice is consistent with the agency's statutory authority." *Securities and Exchange Commission v. Sloan,* 436 U.S. 103, 98 S.Ct. 1702, 1712, 56 L.Ed.2d 148 (1978). A part of the responsibility of the Court is to determine whether the construction has a reasonable basis in law. *Sloan case, supra.*

■ Substantial deference is to be accorded the determinations made by the agency charged with the administration of Acts of Congress. *Querne v. Mandley,* 436 U.S. 725, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978). But, in order for an agency interpretation of a statute being administered by it to be granted deference, it must be consistent with the constitutional purpose. *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). Courts need not defer to the administrative construction or interpretation of a statute where there are compelling indications that such construction is wrong. *Espinoza v. Farah Manufacturing Co., Inc.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287. Courts are not bound to give effect to administrative regulations interpreting a statute, although varying degrees of deference are accorded to administrative interpretations, such as consistency of the agency's position. *Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977). An administrative construction of the legislation governing the agency's operation and authority "is only one input in the interpretational equation." *Sloan case, supra.* On these terms, we now review the specific regulation which plaintiffs challenge.

II.

Since 1975, the Department of Agriculture has permitted certain cured poultry products, fabricated from turkey thigh meat, to be labeled as "Turkey Ham" with-

---

1. Although the defendant–intervenors did not themselves file a motion for summary judg-

ment, they submitted memoranda and argued in support of the Department's motion.

out further qualification. These products are processed with the addition of curing ingredients, such as sodium nitrate, which may impute to them an appearance and taste resembling that of cured ham. The turkey products are shaped and packaged in a number of different ways, including those of customary ham rolls and ovals and of standard sandwich slices.[2] The USDA decision to permit the "Turkey Ham" labeling was apparently based on the opinion that the word "ham," when prefixed by the species name of an animal, refers to the hind limb of that animal. The Poultry Products Inspection Act[3] does not define the word "ham." Rather, the Department's view of the meaning of that word has been based upon the following departmental regulation:

> The word "ham," without any prefix indicating the species of animal from which derived, shall be used in labeling only in connection with the hind legs of swine.[4]

9 CFR 317.8(b)(13).

The American Meat Institute and the National Port Producers Council petitioned the Department of Agriculture to restrict the use of the word "ham" to the labeling of products prepared from the hind legs of swine.[5] The Department thereupon proposed that standards be adopted for products made from cured turkey thigh meat and that those products be labeled as "Turkey Ham," with the contiguous qualifying statement "Cured Turkey Thigh Meat." Following the submittal of various comments concerning the proposed labeling, the Secretary issued a Final Rule amending the poultry products regulations in accordance with the proposal. 9 CFR § 381.171 (1980), 44 Fed.Reg. 51190 (Aug. 31, 1979).

### III.

In the Congressional statement of findings of the Poultry Products Inspection Act,[6] the Congress recognized that unwholesome, adulterated or misbranded poultry products are injurious to consumers, producers and processors of poultry products, and the public welfare. 21 U.S.C. § 451. The Congress therefore provided for the inspection and regulation of poultry products by the Department of Agriculture. For purposes of the Act, the term "misbranded" applies, among other circumstances:

> (1) if its labeling is false or misleading in any particular;
>
> (2) if it is offered for sale under the name of another food;
>
> (3) if it is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word "imitation" and immediately thereafter, the name of the food imitated.

21 U.S.C. § 452. The powers and responsibilities of the Secretary of Agriculture with regard to false or misleading labeling are provided in 21 U.S.C. § 457:

> (b) The Secretary, whenever he determines such action is necessary for the protection of the public, may prescribe: (1) the styles and sizes of type to be used with respect to material required to be incorporated in labeling to avoid false or misleading labeling in marking and labeling any articles or poultry subject to this chapter; (2) definitions and standards of

---

2. Actual examples of "Turkey Ham" products were shown to the Court during oral arguments, in addition to the photographs submitted with the written briefs.

3. 21 U.S.C. §§ 451–470 (1957).

4. The word "ham" means the hind leg of swine, although there are many types of ham, such as smoked ham, corned ham, fresh ham, baked ham, sliced ham, country ham, Smithfield ham, and so on, but all of these refer to the hind leg of swine.

5. 21 U.S.C. § 601 of the Meat Inspection Act, in subparagraph (j) defines "meat food product"

as any product capable of use as human food which is made wholly or in part from any meat or other portion of the carcass of any cattle, sheep, swine or goats. 21 U.S.C. § 453 of the Poultry Products Inspection Act defines "poultry product" as any poultry carcass or part thereof, or any product which is made wholly or in part from any poultry carcass or part thereof.

6. A similar statutory scheme exists as to meat and meat food products. *See* the Meat Inspection Act, 21 U.S.C. §§ 601–695 (1907).

identity or composition or articles subject to this chapter . . ..

(c) No article subject to this chapter shall be sold or offered for sale by any person in commerce, under any name or other marking or labeling which is false or misleading, or in any container of a misleading form or size, but established trade names and other marking and labeling and containers which are not false or misleading and which are approved by the Secretary are permitted.

(d) If the Secretary has reason to believe that any marking or labeling or the size or form of any container in use or proposed for use with respect to any article subject to this chapter is false or misleading in any particular, he may direct that such use be withheld unless the marking, labeling, or container is modified in such manner as he may prescribe so that it will not be false or misleading.

■ Before approving a poultry product label, it is necessary that the Secretary make sufficient inquiry so as to help ensure that the label not be false or misleading. *See Community Nutrition Institute v. Butz*, 420 F.Supp. 751 (D.D.C.1976). Such inquiry is especially important where there exists an obvious and inherent propensity of the proposed label to mislead and confuse a substantial number of consumers, as with a label for "Turkey Ham."

■ The materials and evidence before the Secretary could only have led him to conclude that the proposed label "Turkey Ham–Cured Turkey Thigh Meat" is misleading to a substantial number of consumers. According to the Secretary's own count, a clear majority of the comments received were in opposition to the rule proposal. There were 553 submittals received by the Secretary, representing the views of

854 individuals and organizations. Of those individuals and organizations, 369 expressed support for the proposal, 481 were in opposition to the proposal,[7] three were uncommitted, and one was a recorded duplicate. A summary of the comments was published in conjunction with the Final Rule. *See* 44 Fed.Reg. 51187, 51188 (Aug. 31, 1979).

Because so many of the comments received expressed opposition to the proposed label, the Secretary was on notice that a serious problem of misbranding might exist. No effort was made, however, to gather any reliable evidence that the label "Turkey Ham–Cured Turkey Thigh Meat" would not mislead a substantial number of consumers into believing the product might contain at least some pork. The Secretary was in possession of the results of two consumer surveys, but neither of those surveys tested consumer understanding of the "Turkey Ham–Cured Turkey Thigh Meat" label that was actually proposed. The results of the surveys dealing with differently worded "Turkey Ham" labels are of questionable reliability in evaluating the extent to which the proposed label may be misleading.

If the consumer surveys available to the Secretary showed anything about the proposed label, it was that even with the qualifying language the label might still confuse or mislead a substantial number of consumers. The first of the two surveys was conducted in March 1977 by Westat, Inc., an independent consulting firm.[8] Over three–quarters (80.2 percent) of the Westat study respondents associated the word "ham" with pork or ham meat, while only 3.2 percent associated the word with the "smoked or cured thigh of any animal" and .7 percent with the "cut of any animal." The study further concluded that there exists a significant amount[9] of consumer deception

---

**7.** Most of these 481 comments were specifically opposed to the use of the word "Ham" in the label.

**8.** The survey was conducted at the request of the American Meat Institute and the National Pork Producers Council. The results of the survey were submitted by the two organizations to the USDA in support of their petition

to restrict the word "ham" to products made from the hind legs of swine.

**9.** The Westat survey sought to discover a statistical "belief value" for various conceivable consumer beliefs concerning "Turkey Ham." An explanation of the study's procedures and conclusions is contained in the administrative record and need not be restated here.

with regard to whether a product labeled "Turkey Ham" contains any pork meat.

The Department of Agriculture indicated to the American Meat Institute that it had certain reservations concerning the results of the Westat survey. The Department thereupon retained Caravan Surveys, a division of Opinion Research Corporation, to conduct a second survey of consumer perceptions of the term "Turkey Ham." The survey involved a total sample of 2,049 adults, divided into three subsamples. Each subsample was shown a food product label as follows: 677 adults were shown a "Turkey Ham" label; 686 adults were shown a "Turkey Ham–No Pork" label; and 686 adults were shown a "Holiday Ham" label.

The results of the Caravan Survey indicated that a substantial proportion of consumers were misled by the labeling of an all–turkey product as "Turkey Ham." When shown an unqualified "Turkey Ham" label, ten percent thought the label was for a "ham" product and nine percent thought it was for a "turkey and ham" product. The responses were as follows: [10]

| RESPONSE | PERCENTAGE OF TOTAL PUBLIC |
| --- | --- |
| HAM | 10 |
| TURKEY | 40 |
| TURKEY HAM | 13 |
| TURKEY AND HAM | 9 |
| ARTIFICIAL HAM MADE FROM TURKEY/TURKEY MADE LIKE HAM | 14 |
| THIGH/DRUMSTICKS | 7 |
| COOKED/PRE–COOKED | 5 |
| BONELESS | 6 |
| CANNED | 5 |
| SMOKED | 11 |
| OTHER ANSWERS | 11 |
| DON'T KNOW/NO ANSWER | 7 |

The Caravan Survey also tested consumer understanding of the label "Turkey Ham (No Pork)." Seven percent of the respondents thought the label was for a "ham" product and eight percent thought it was for a "turkey and ham" product. The responses were as follows: [11]

**10.** The percentage amounts do not add up to 100 because multiple responses were permitted.

**11.** The percentage amounts do not add up to 100 percent because multiple responses were permitted.

| RESPONSE | PERCENTAGE OF TOTAL PUBLIC |
| --- | --- |
| HAM | 7 |
| TURKEY | 42 |
| TURKEY HAM | 13 |
| TURKEY AND HAM | 8 |
| ARTIFICIAL HAM MADE FROM TURYKEY/TURKEY MADE LIKE HAM | 10 |
| THIGH/DRUMSTICKS | 15 |
| COOKED/PRE–COOKED | 13 |
| BONELESS | 6 |
| CANNED | 6 |
| SMOKED | 3 |
| OTHER ANSWERS | 14 |
| DON'T KNOW/NO ANSWER | 10 |

The Department of Agriculture has itself recognized that an unqualified "Turkey Ham" label is misleading:

> The results of the market survey and the comments submitted in response to the proposal indicate that the term "Turkey Ham" without further qualification appears to have been incorrectly understood by many persons to represent a product containing pork. Accordingly, it has been determined that the name "Turkey Ham" without further qualification would cause such products to be misbranded and, therefore, could not be used as the standard name for the product.

44 Fed.Reg. 51187, 51188 (Aug. 31, 1979).

The Department thereupon concluded that the qualifying language "Cured Turkey Thigh Meat" would adequately apprise consumers that a "Turkey Ham" product does not contain any pork meat. The Caravan Survey revealed, however, that the qualifying language "No Pork" would not significantly reduce the number of consumers misled by the term "Turkey Ham." Nowhere in the Secretary's Final Rule does there appear any analysis concerning the survey results of consumer understanding of the term "Turkey Ham–No Pork." Nor is there any indication by the Secretary as to what may be the basis for believing that the qualifying language "Cured Turkey Thigh Meat" would be as strong or stronger than the language "No Pork." [12] Indeed, it

**12.** As previously indicated, no survey has been undertaken to test consumer understanding of the label "Turkey Ham–Cured Turkey Thigh Meat."

would appear only logical that the term "No Pork" would more effectively qualify "Turkey Ham" than would "Cured Turkey Thigh Meat," since the former states expressly what can at best only be implied in the latter. It is therefore entirely possible that the approved label is not a significant improvement over the unqualified "Turkey Ham" label which the Department has already determined to be misleading.

### IV.

For the reasons stated herein, the Final Rule of the Food Safety and Quality Service, USDA, as published in 9 CFR § 381.-171 (1980), 44 Fed.Reg. 51190 (Aug. 31, 1979) is arbitrary, capricious, an abuse of discretion, and in excess of statutory authority. The Department's inquiry was wholly inadequate to determine whether the proposed label "Turkey Ham–Cured Turkey Thigh Meat" might confuse or mislead a substantial number of consumers into believing such products contain pork meat. Its conclusion that the qualifying language "Cured Turkey Thigh Meat" will adequately reduce any confusion or deception admitted to exist with the unqualified "Turkey Ham" label is based upon mere supposition and guesswork. Before the Department may lawfully approve any "Turkey Ham" label, it must conduct proper inquiry into the possible misleading character of the particular proposed label and it must then adequately explain its analysis and reasoning. *Tanners Council of America, Inc. v. Train*, 540 F.2d 1188, 1191 (4th Cir. 1976). Inasmuch as no such inquiry and analysis by the Department has been made, any approval by the USDA of any food product label containing the term "Turkey Ham" is not in accordance with law. It is therefore ORDERED that the defendant Department of Agriculture and its officers, agents, servants, employees, or successors and attorneys and those in active concert or participation with them are hereby permanently enjoined and restrained from enforcing or applying 9 CFR § 381.171 (1980), 44 Fed. Reg. 51190 (Aug. 31, 1979).

■ It is noted that the plaintiffs in this case seek to permanently enjoin the Department from ever approving any turkey product label bearing the term "Turkey Ham." Such broad relief should be and is denied. First, the record would not justify it, and secondly, it would unduly infringe upon the Department's statutory authority to approve food product labels when properly found not to be false · or misleading. Though "ham" seems to designate only the hind leg of swine, it may well be that proper inquiry and analysis will demonstrate that the particular label here at issue, or some other qualified label like "Turkey Ham," does not in fact constitute a false or misleading label.

■ Finally, the Court declines to order that any "Turkey Ham" product is an "imitation" ham and must be so labeled. Mere resemblance of products is not enough to constitute imitation. *See United States v. 651 Cases, etc.*, 114 F.Supp. 430, 432 (N.D.N.Y.1953). Rather, the word "imitation" connotes inferiority in the sense that the product is cheapened by the substitution of ingredients. *National Pork Producers Council v. Bergland*, 484 F.Supp. 540, 551 (S.D.Iowa 1980). An all–turkey product, though processed and formed in a shape or manner similar to that of a customary pork ham, probably is not intended to be an imitation of a customary ham. An all–turkey product is fundamentally distinct from an all–pork product. Neither meat is a substitute of the other in such products. Furthermore, at issue is whether the word "ham" may be used to indicate the thigh of a poultry product or whether it is meat, and limited to the use of the hind leg of swine. If it is determined upon proper inquiry and analysis that a qualified "Turkey Ham" label could be used without the reasonable probability of misleading consumers, then the further inclusion of the phrase "imitation ham" would be unnecessary and even self–contradictory.

Copy of this Order is forwarded to counsel for plaintiffs, defendant Department of Agriculture, and defendant–intervenors.