**AMERICAN PETROLEUM INSTITUTE, et al., Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 87–4835.

United States Court of Appeals, Fifth Circuit.

Oct. 26, 1988.

James K. Jackson, G. William Frick, Washington, D.C., for petitioners.

David M. Gravallese, Ashley Doherty, Lee M. Thomas, Adm'r., U.S.E.P.A., Washington, D.C., for respondent.

Before GEE, DAVIS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

### I.

The American Petroleum Institute (API) and four individual oil companies petition us to invalidate Environmental Protection Agency (EPA) regulations imposing certain restrictions upon oil companies that drill offshore in Alaskan waters. We have previously upheld the criteria under which such permits are issued. *API v. EPA,* 787 F.2d 965, 975–77 (5th Cir.1986). In that opinion, we ordered the EPA to substantiate further its pill-substitution[1] regulations. In response, EPA has reissued revised substantiation for BAT-level control[2]

---

1. Normally, thousands of barrels of "mud" lubricate the drilling pipe and bit and carry the drill cuttings to the surface. The industry is usually allowed to dispose of this mud in the surrounding waters. When the pipe becomes stuck, however, additional lubrication is required. In these cases, a "pill" of oil or other additives is circulated down the drilling hole. Pills are made up of mud buffers on either end of a significant amount of diesel oil or mineral oil. These pills may not be discharged into the surrounding waters, and the industry is usually required to dispose of the pill in approved land hazardous materials management sites. This

EPA permit for Alaskan waters effectively condemns the entire mud system to on-land disposal if diesel oil is used in the pill. Our prior opinion more expansively described the functions of drilling muds and pills. 787 F.2d at 971.

2. EPA ordinarily regulates conventional pollutants according to best conventional pollutant technology (BCT); the current list of conventional pollutants, 40 C.F.R. § 401.16, does not include any oils. The agency is empowered to use the more stringent best available technology (BAT) economically achievable for pollutants

of diesel oil, effectively requiring drillers to use mineral oil, rather than diesel oil, as a drilling additive to lubricant mud. Finding that EPA has adequately supported its pill-substitution regulations, we uphold the requirements placed upon permitees. Accordingly, API's petition is denied.

## II. *The Appropriate Method of BAT–Level Control.*

Virtually conceding agency authority, API argues that EPA's permit scheme is flawed because, even if diesel oil may be characterized in such a way as to merit BAT treatment, EPA chose an improper method from among the alternative BAT-level technologies. The continuing controversy in this seven-year litigation is whether mineral oil pill-substitution is the appropriate BAT-level technology.

EPA determined that the best available technology for limiting diesel oil discharges is product substitution, so EPA required the industry to use mineral oil instead of diesel oil in the pills it circulates down wellheads being drilled. If industry pre-fers, it may continue to use diesel oil pills, but must barge the entire mud system for on-land disposal; while API asserts that the barge alternative is not realistic for Alaskan waters, water discharge is allowed so long as no diesel oil has been used in the pills.

API contends that EPA applied the wrong standard in determining that mineral oil was an appropriate product substitute. In arguing its position, API focuses upon which survey data the EPA relied in determining that mineral oil is an appropriate substitute for diesel oil in pills. EPA followed its regulations in ordering the substitution, and its interpretation of the various surveys and choice between indicated outcomes commands great deference.

■ Indeed, we review deferentially not only EPA's factual evaluations, but also its statutory and regulatory interpretation and application, and its policy determinations. We have previously instructed API and the agency that the restraint we exercise in such administrative review requires us to

classified as toxic (pursuant to 33 U.S.C. § 1317(a)(1) and currently listed at 40 C.F.R. § 401.15) or as nonconventional (those not defined as toxic or conventional), although the latter are controlled subject to some modifications to the BAT limitations.

The regulations allow EPA to impose the more stringent BAT limitations to control conventional pollutants and to remove the modifications required for nonconventional pollutants, if that pollutant may be characterized under 40 C.F.R. § 125.3(h)(1) as an "indicator," that is, a carrier of toxic pollutants. EPA found diesel oil to be an indicator pollutant and determined that the "most appropriate means at this time of regulating the toxic pollutants contained in diesel oil is to prohibit the discharge of muds and cuttings contaminated with diesel oil." 51 Fed.Reg. 29,607.

This issue centers on EPA's characterization of diesel oil as an indicator, a ruling that serves as the predicate for the imposition of BAT-level controls on diesel oil discharges. Scientific research indicates, virtually without dissent, that diesel oil is a toxic carrier, and hence appropriately labeled an indicator pollutant. EPA now has more than adequately substantiated such classification, as required by our previous decision, 787 F.2d at 975–76, and EPA can, therefore, impose a blanket prohibition of discharges into surface water or aquifer of any drilling muds and drill cuttings that have contained diesel oil. *See* Clean Water Act of 1977, Pub.L.

No. 95–217, 91 Stat. 1566 (codified and amended at 33 U.S.C. § 1251 *et seq.* (1982)); 4 Leg. Hist. of the Clean Water Act of 1977: A Continuation of the Leg. Hist. of the Fed. Water Poll. Control Act, 95th Cong., 2d Sess. 1469–70 (1978); *API v. EPA,* 661 F.2d 340, 344 (5th Cir. Unit A Nov. 1981).

API argues that diesel oil is improperly characterized as an indicator pollutant because it cannot be both an indicator and a conventional pollutant, as API thinks present classifications make it. The list of conventional pollutants does include "oil and grease," 40 C.F.R. § 401.16 (1986), but does not specifically mention diesel oil. We do not agree with API's contention that its plain-meaning inclusion within the "oil and grease" family necessitates BCT treatment for diesel oil. Stricter BAT-level limitations are justified by indicator designation and, although the parties debate at length whether diesel oil is properly characterized as conventional or nonconventional, EPA points out that this argument misses the point: A pollutant may be assigned indicator status whether it is classified conventional or nonconventional. Consequently, diesel oil would not have to be formally classified as a conventional pollutant within "oil and grease," or even be subject to such specification, to allow EPA to impose appropriate regulation or prohibition as "technologically and economically achievable." EPA has done enough research to allow it so to designate diesel oil.

uphold agency action when it has appropriately enforced its statutory mandate. *API v. EPA*, 661 F.2d at 349 ("[The agency's] decision need not be ideal or even, perhaps, correct so long as not 'arbitrary' or 'capricious' and so long as the agency gave at least minimal consideration to the relevant facts as contained in the record.").[3] Certainly the data is subject to dispute, but we cannot say that EPA's conclusions are unfounded.

API also argues, without citation to authority, that the product substituted must be "operationally equivalent" to diesel oil before EPA may require the substitution. EPA counters that the substitution must be only "technologically and economically achievable." 33 U.S.C. § 1311(b)(2)(A). Our remand to the agency was confined to the diesel-oil provision, and EPA has now developed evidence to meet our concerns.

Upon remand, EPA considered survey data gathered from wells on which diesel oil and mineral oil pills were used and concluded that the substitution met the "achievability" standard. EPA is correct that API is without legal support for its contention that a technology must be widely used in the industry to be considered as an appropriate product substitute. While acknowledging that mineral oil is used for pills less frequently than is diesel oil, EPA argues that it is presently used in some circumstances and demonstrably can be used effectively in the future. Even if mineral oil is not the industry's choice as an additive for lubricant mud, and even if this plausible substitute is only most rarely seen in practice, studies support feasibility (at an added cost); thus, mineral oil replacement for toxic-carrying diesel oil is "technologically and economically achievable."[4]

3. We recently repeated the commonplace adage that "[w]e are required to defer to any reasonable EPA construction of its enabling statutes. When resolving an apparent conflict among EPA regulations, even greater deference is in order." *See Texas Mun. Power Agency v. EPA*, 836 F.2d 1482, 1488 (5th Cir.1988) (footnote omitted). *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) ("[The] court is not empowered to substitute its judgment for that of the agency."); *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) (a reviewing court "must generally be at its most deferential" when reviewing an agency's scientific determinations in an area within the agency's technical expertise); *San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 37 (D.C.Cir.) (en banc), *cert. denied*, 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986) (we view under this highly deferential review presumes the validity of agency action and so is limited to determining whether their terms and conditions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" pursuant to 5 U.S.C. § 706(2)(A)); *BASF Wyandotte Corp. v. Costle*, 614 F.2d 21, 22 (1st Cir.), *cert. denied*, 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980) (EPA's regional administrators' considerable discretion in setting, applying, and enforcing BAT effluent limitations should not be disturbed without a showing of a compelling lapse in administrative judgment); *Weyerhauser Co. v. Costle*, 590 F.2d 1011, 1061 (D.C.Cir.1978) (with regard to analytical methodology for deriving pollutant limitations and measuring compliance therewith, EPA's choice from among an array of diverse approaches is appropriately accorded the great deference due regulating entities' factual determinations and policy choices under their statutory mandate); *Tanners' Council of Am. v. Train*, 540 F.2d 1188, 1195 (4th Cir.1976) (such policy choices are "best left in the hands of the Agency").

4. API argues that the EPA's substitution of mineral oil for diesel oil is improper because EPA inadequately considered the statutory factors required for BAT-level limitations. Before EPA selects BAT-level limitations, it is required to address both (1) operational considerations, including "the process employed, the engineering aspects of the application of various types of control techniques [and] process changes," and (2) cost, including "the cost of achieving such effluent reduction[,] non-water quality, environmental impact [and] energy requirements." 33 U.S.C. § 1314(b)(2)(B).

In arguing this point, API asserts that mineral oil is not as effective as diesel oil for pill usage, indicating that the substitution does not meet operational standards. API estimates that the use of mineral oil pills could add as much as $30 million to the cost of drilling off the Alaskan coast over the next ten years. In addition, API argues that "one to three wells will be needlessly lost if only the Agency's product substitute (i.e., mineral oil) is used."

It is significant that API attacks the EPA's conclusions and the data upon which it is based in asserting that the EPA's action was arbitrary and capricious. EPA based its ruling on various surveys of pill usage in the Gulf of Mexico, and API disputes the agency's interpretation of that data. Neither the mineral oil evaluation nor

However, under existing environmental legislation a process is deemed "available" even if it is not in use at all. *Association of Pac. Fisheries v. EPA*, 615 F.2d 794, 816 (9th Cir.1980) (upholding imposition of BAT burdens based upon a single study of a specific technology, which was not in actual use in any sector of the industry). Such an outcome is consistent with Congress' intent to "push pollution control technology." *Weyerhauser*, 590 F.2d at 1061.

◼ One further concern motivated our inquiry here: API's repeated argument that toxic-carrying diesel pills pose no environmental threat when discharged in the relatively small volumes of mud typical of Alaskan operations.[5] However, the Clean Water Act permits blanket prohibitions and other "stringent pollution restrictions" to be imposed "even where the discharge

caused no discernible harm to the environment." *API v. EPA*, 661 F.2d at 344. *Accord, Hooker Chem. & Plastics Corp. v. Train*, 537 F.2d 620, 622 (2d Cir.1976).

◼ "Analogous to a strict liability standard," *API v. EPA*, 661 F.2d at 344, BAT limitations properly may require industry, regardless of a discharge's effect on water quality, to employ defined levels of technology to meet effluent limitations; a direct cost/benefit correlation is not required, so even minimal environmental impact can be regulated, so long as the prescribed alternative is "technologically and economically achievable." 4 Leg. History of the Clean Water Act of 1977: A Continuation of the Leg. History of the Fed. Water Pollution Control Act, 95th Cong., 2d Sess. 1469–70 (1978).[6] Because the basic requirement for BAT effluent limitations is only that they

---

EPA's rejection of (allegedly less costly) alternate or additional treatment processes are open for our reconsideration; as long as the policy choices reached are supported in the scientific record, we cannot second-guess the agency's decision. We note, however, that EPA's data and factfinding explicitly addressed the problem that "existing pill recovery techniques have not been shown to be effective in reducing the diesel oil content and toxicity of discharged muds." 50 Fed.Reg. 29,606–07; 52 Fed.Reg. 36,465–66; 50 Fed.Reg. 23,589; R. 41417. *See Hooker Chem. & Plastics Corp. v. Train*, 537 F.2d 620, 636 (2d Cir.1976) (data from a pilot plant, or other reliable data, is sufficient so long as it is shown that the technology can be applied to the industry).

Finally, the parties dispute whether EPA is required to compare the cost of effluent reduction with the degree of pollutant removal. API asserts that EPA is under a duty to make a reasonable determination with regard to cost effectiveness, but, as is further discussed below, EPA is not required to show a direct cost/benefit correlation, but only that a beneficial substitution is "technologically and economically achievable." 33 U.S.C. § 1311(b)(2)(A).

EPA thoroughly documented its factfinding and clearly followed its regulations and the Clean Water Act when redrafting these permits. The evidence amply supports the agency's factual determinations.

5. Citing 40 years in which diesel oil has been discharged "without environmental damage" to the Outer Continental Shelf, API argues that "the discharge of approximately 24 barrels of diesel oil per year [into] the general permit areas encompass[ing] thousands of square miles of open ocean ... will be avoided at an annual cost of nearly $6,000,000.00"; this "infinitessimal" impact at a "monumental" cost is indica-

tive of Region 10's administrators' "perverse" and "obsessive" disregard of correct agency decisionmaking in order to ban effluents with *de minimis* environmental harm and proves that "this limitation is not based upon any adverse impact to the receiving water." Under BCT-level control, EPA is not allowed to impose "treatment for treatment's sake [but must consider] 'the reasonableness of the relationship between the costs of attaining a reduction in effluents and the effluent reduction benefits derived.'" *API v. EPA*, 787 F.2d at 976 (quoting 33 U.S.C. § 1314(b)(4)(B)). However, BAT-level limitations are not subject to such a strict cost/benefit correlation.

6. Thus, we here affirm the agency's enforcement of its mandate pursuant to Congress's legislative policy determination. In this regard, we must be ever cognizant that "[w]e are judges, not legislators." *Boyle v. United Technologies Corp.*, — U.S. —, —, 108 S.Ct. 2510, 2528, 101 L.Ed.2d 442 (1988) (Brennan, J., dissenting). Congress and the agency have not recognized a *de minimis* exception regarding BAT limitations; we express no opinion on those decisions. If the trade-off between economic burden and environmental purity "has been skewed in the wrong direction, it is for the legislative and executive branches, not the courts, to correct that imbalance." *State of La. ex rel. Guste v. Verity*, 853 F.2d 322, 332 n. 20 (5th Cir.1988). EPA now has adequately considered economic impact. *Cf. API v. EPA*, 661 F.2d at 356 ("We have no way of knowing whose [economic-impact assessment] study is more correct, nor do we regard that as an appropriate matter for judicial inquiry. What is clear is that the parties' figures differ radically. Although EPA has made an effort to calculate

be technologically and economically achievable, the impact of a particular discharge upon the receiving water is not an issue to be considered in setting technology-based limitations. *See API v. EPA,* 661 F.2d at 344; *Association of Pac. Fisheries v. EPA,* 615 F.2d at 816.

### III. *Gas Chromatography.*

API argues that we should invalidate that portion of the permit requiring the use of gas chromatography tests for monitoring the presence of diesel oil and waste. Not only is the agency due great deference with regard to its choice of analytical methodology for measuring compliance with pollutant limitations it has established, *Weyerhauser,* 590 F.2d at 1061, but this aspect of the prior EPA action was considered and determined enforceable when these permit regulations last appeared before us. 787 F.2d at 984. Hence, API's argument is without merit.

### IV. *Conclusion.*

EPA has amply supported its permit requirements, and we accordingly uphold the pill-substitution regulation. API's petition is DENIED.

the total cost, as required by the Act, the discrepancy between the ... studies, a discrepancy unexplained by EPA, leads us to conclude that EPA has not satisfactorily fulfilled its obligation of cost analysis. Its failure necessitates a remand for the purpose of comparing and explaining the differences.").